```
1                    UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF ILLINOIS
2

3   PAINCARE ACQUISITION COMPANY,  ) Docket No. 07-CV-00478-GPM
    V, Inc.,                       )
4                                  )
             Plaintiff,            )   Benton, Illinois
5                                  )   July 2, 2007
    vs.                            )
6                                  )
    INDUSTRIAL & SPORT             )
7   REHABILITATIVE, LTD, et al.,   )
                                   )
8            Defendants.           )

9                    TEMPORARY RESTRAINING ORDER
            BEFORE THE HONORABLE G. PATRICK MURPHY
10             UNITED STATES DISTRICT COURT JUDGE

11
    APPEARANCES:
12
    For the Plaintiff:    Mr. Thomas F. Hennessy, III
13                        Greensfelder, Hemker & Gale, P.C.
                          12 Wolf Creek Drive
14                        Belleville, Illinois 62226
                          Phone:  618-257-7308
15                        Fax:    618-257-7353
                          Email:  th@greensfelder.com
16
    For the Defendants:   Mr. Hal R. Morris
17                        Arnstein & Lehr, LLP
                          120 South Riverside Plaza, Suite 1200
18                        Chicago, Illinois 60606-3910
                          Phone:  312-876-7185
19                        Fax:    312-876-0288
                          Email:  hrmorris@arnstein.com
20
                          Mr. Kenneth M. Burke
21                        Brown & James
                          120 West Main Street
22                        Belleville, Illinois 62221
                          Phone:  618-235-5590
23                        Email:  kburke@bjpc.com

24  Court Reporter:       Jane McCorkle
                          301 W. Main Street
25                        Benton, Illinois 62812
                          618-439-7725
```

FILED
JUL -3 2007
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
BENTON OFFICE

13

```
 1              THE CLERK:  Court calls PainCare Acquisition
 2   Company, Inc., versus Industrial and Sport Rehabilitative,
 3   LTD, et al.  This matter is called for a temporary
 4   restraining order, case number 07-478.  Are the parties
 5   ready?
 6              MR. BURKE:  Ken Burke for plaintiff, along with Hal
 7   Morris from Chicago.
 8              THE COURT:  Morning, counsel.
 9              MR. HENNESSY:  Your Honor, Tom Hennessy with the
10   law firm of Greensfelder, Hemker & Gale, P.C.  With me are
11   client representatives, John Vick and Dr. Larry Vick.
12              THE COURT:  All right.  Mr. Vick.  Well, the matter
13   is before the Court today on an application for a temporary
14   restraining order pursuant to notice.  Mr. Hennessy, you
15   probably read my docket order, but it appears that notice has
16   been affected in this case; is that correct?
17              MR. HENNESSY:  Well, all the parties, the
18   defendants, were made aware of it.  We learned on Saturday.
19              THE COURT:  All right.  Thank you.
20              MR. HENNESSY:  Thank you, Your Honor.
21              THE COURT:  Now, let's see if my understanding of
22   the case is, basically, correct from looking at the papers.
23   Mr. Burke, your client is a management group, a Florida
24   Corporation, a subsidiary of a larger company.  And pursuant
25   to a detailed written contract, purchased the physical assets
```

1  of this medical practice in the Metro East.
2           MR. BURKE:  That's correct, Judge.
3           THE COURT:  At least from what I can tell from the
4  papers, there is a dispute -- when I say this, I'm saying
5  looking from a judge who's not in a position to know what the
6  facts are other than what's on the papers -- whether there's
7  a breach of contract.  What you're asking the Court to do, it
8  sounds like, is to order the defendant to disgorge some funds
9  that they're holding or that they have acquired and give to
10 the management group; is that correct?
11          MR. MORRIS:  If I might, Your Honor.  Not
12 precisely.  What we're asking the Court to do is to have the
13 defendants return to the status quo ante, the way it was
14 being managed before.  That the plaintiff, PainCare
15 Acquisition, has access to the accounts, of the business, et
16 cetera, and manage pursuant to the contract versus something
17 that is disgorgement of monies at this TRO stage.
18          THE COURT:  So you are not asking them to turn over
19 money at this time?
20          MR. MORRIS:  It's to allow access to the bank
21 accounts, which are referred to as the practice account,
22 which is the nongovernmental bank accounts for revenue.
23          THE COURT:  All right.  Now, Mr. Hennessy, do you
24 want to expand on that, my understanding of where we are
25 today?

1           MR. HENNESSY:  Yes, Your Honor, I would like to.
2  Firstly, Your Honor, where we're at today is that as we've
3  disclosed to the Court, we filed a termination of the
4  agreement with the practice manager because they were
5  improperly using funds of Associated Physicians Group, the
6  practice itself.  As they, in fact, allege, one of their
7  responsibilities is to pay the creditors of APG, Associated
8  Physicians Group.  They did not do so on a timely basis, and
9  as a result and as the affidavits reflect, APG was severely
10 disadvantaged.  So the bottom line is, Your Honor, from our
11 standpoint, we don't want the Court to afford them an
12 opportunity to engage in what we contend, and the evidence
13 supports, is a severe misconduct with regard to those funds.
14           THE COURT:  All right.  Now here's where we go from
15 here.  Mr. Burke, as you know, in the district court a
16 temporary restraining order is a -- who's lead counsel here
17 today?  I'm speaking to Mr. Burke.
18           MR. MORRIS:  It's actually probably me, Your Honor.
19           THE COURT:  All right.  It's a rare day when we
20 actually give a temporary restraining order, the idea being
21 that the Court simply looks at the papers and says, "Looking
22 at the papers, if I don't do this, the consequences are
23 extreme."  Let me give you an example here.
24           Sometime ago someone who was a disgruntled
25 landowner had his backhoe and was about to dig up a 24-inch

1  pressurized product pipeline out of the ground with
2  pressurized gas because he was not happy with the way the
3  pipeline company had treated him.  Well, of course, in a
4  situation like that, unless the farmer was better at
5  operating his backhoe than the company was with public
6  relations, we might have blown up Union County.
7          What we are talking about here is largely a matter
8  of money.  What is it that's so extreme in this case that the
9  Court should today, just on the paper, grant a restraining
10 order rather than proceeding with a full-blown hearing on a
11 preliminary injunction with witnesses and evidence where I
12 can assess the credibility of the witnesses.
13         MR. MORRIS:  Judge, if I can respond to that and
14 maybe first --
15         THE COURT:  Please.
16         MR. MORRIS:  -- to put it in the right context as
17 far as what counsel said.  The breach that counsel is talking
18 about was first made in a June 18th letter under the
19 agreements.  Specifically, Section 11.2, which is Exhibit B
20 of what you have, there's a 30-day cure period.  Simple math
21 demonstrates that cure period has not yet expired so there
22 can't be a breach.  That's the first piece of context we need
23 to have.
24         Secondly, why does it need to be done today or
25 tomorrow or some other day?  When this practice was purchased

1  through the merger agreement in 2003 there was significant
2  consideration paid.  It was 2.75 million dollars in cash and
3  another 2.7 million dollars in stock that was a matter of
4  money pushed across the table one way or the other.  But the
5  import of that was the material portion of inducement to do
6  that was to get this management service's agreement between
7  the plaintiffs and the defendants.
8           That agreement, because of the way that the
9  practice is being managed and run, puts certain item's assets
10 into the ownership of the plaintiff.  If you look at the
11 specific agreements which I'm sure the Court has, the
12 practice accounts, which is what we are talking about in the
13 first instance, are accounts that the access has to be for
14 the plaintiff.  They're denying access to those accounts.
15          Secondly, there are premises and equipment that are
16 now being used, apparently, by the defendant that under the
17 contract, the lessee of that premises is the plaintiff's.
18 The equipment through the merger agreement is the
19 plaintiff's.  They are using our equipment, our premises.  In
20 some respects, it's the old replevin-type of action.
21          Thirdly, the plaintiff also provided other
22 nonmedical assets to the defendants under the contract.
23 Those assets are being used.  There are restrictive covenants
24 that are also in play in these agreements.  The restrictive
25 covenant is the fact that the defendants will not go into,

1  essentially, competition with the plaintiff, this practice
2  management company. By taking over and not permitting the
3  plaintiff to have the access, but permitting the plaintiff to
4  have the management of those accounts, they've, essentially,
5  taken over now and are competing with the plaintiff. They're
6  doing it on their own accord.
7           Counsel, perhaps, best said it when he said, "We
8  terminated the contract." Although I submit to the Court the
9  termination is certainly not proper and clearly not even
10 proper, yet under the termination provisions, what they've
11 done is they've admitted that they've now gone into
12 essentially, competition. They've gone into business for
13 themselves contrary to the 2.75 upfront payment, millions of
14 dollars, and the ongoing relationship.
15          And finally, the nonmedical records and the books
16 of account we are also talking about here remain the property
17 of the plaintiff under the agreement. Those, also, we are
18 seeking access to. So why is it immediate or, as the Court
19 points out, tomorrow or the next day? Because we are talking
20 about the particular assets, the particular fact that they
21 are now competing with the plaintiff.
22          THE COURT: How can they compete with your client?
23          MR. MORRIS: Because what they are doing is,
24 they're running their own business, essentially, with our
25 assets, the noncompete provisions of this, and we have taken

```
 1  it outside of the medical provision.  This is not a corporate
 2  practice of medicine.  We don't practice medicine.
 3            THE COURT:  Right.
 4            MR. MORRIS:  But they have agreed under various
 5  agreements, the management service agreement, that they would
 6  not either be involved in, have access to, or they would
 7  compete in a competing medical practice-type business where
 8  the plaintiff was managing for them.  And that's precisely
 9  what they've done.  All of those, I would submit to the
10  Court, as the type of matters that can and many times are
11  heard by the federal courts by way of injunctive relief today
12  versus tomorrow or some other day.
13            In addition, what we really have is, I think, the
14  bottom line is the defendant saying I want out and I'm going
15  to get out any way I want by simply not dealing with you, not
16  complying with the contract, not waiting for the cure period
17  to run, and simply taking what is, otherwise, not theirs and
18  using it.
19            So in summary, Your Honor, we would submit on the
20  plaintiff's side that the plaintiffs have established under
21  the documents in front of the Court that it is the type of
22  case that emergency injunctive relief is appropriate to stop
23  them, essentially, using what is not theirs, competing in a
24  way that was not contemplated by the parties and was to be
25  remedied by an injunction and, especially, to put the parties
```

1  back where they were.
2      If this is the kind of case that ultimately we're
3  going to fight about who's in default, who's not in default,
4  et cetera, we can do that better and more efficiently by not
5  allowing the defendant to leap-frog forward and take
6  everything over, but to put us back where we were before and
7  then sort it out at a later date.
8      THE COURT: Now, the inevitable argument is, and
9  you might as well answer it now, why isn't just an award of
10 damages an adequate remedy of law in this case?
11     MR. MORRIS: There are a variety of answers to
12 that. One reason for an award of damages is that the parties
13 contemplated injunctive relief.
14     THE COURT: That's between you. The United States
15 District Court will not be ever controlled by an agreement of
16 the parties unless it wants to exercise jurisdiction for the
17 obvious reason that the parties are at liberty to commit all
18 kinds of error, but I'm not. And the other thing is, if I do
19 enter an order pursuant to the parties' agreement, then the
20 Court's forced to vindicate for it, which means putting
21 people in jail when we are talking about injunctions, and I'm
22 reluctant to do that even if somebody's foolish enough to
23 agree with it. So you would say, then, besides the
24 agreement, why would not the remedy at law be?
25     MR. MORRIS: I would say two things. One, the

1  signed agreement being what the parties contracted for, and
2  second, what the parties contracted for, I submit, that it is
3  supported by the law.  It would be an appropriate exercise of
4  the Court's discretionary action.
5            Thirdly, and perhaps most importantly, when you put
6  it in the context of what's going on here, money can't solve
7  it because it's a business we're talking about.  We're
8  talking about them taking over the business and the business
9  opportunities of the plaintiff.
10           It's insufficient to simply say, "Well, I told you
11 my business, but I'm going to take it back.  I'll pay you
12 some money."  That isn't appropriate because we have a vested
13 and protected interest in our business expectancy.  That's
14 really what's happening here is our business expectancy is
15 being taken away.
16           THE COURT:  All right.  I understand that.  Well,
17 Mr. Hennessy, what do you have to say?
18           MR. HENNESSY:  Firstly, Your Honor, counsel keeps
19 talking about competing with the plaintiff's business
20 opportunities.  It's important for the Court to understand,
21 and as I'm sure the Court does, and even the agreements
22 reflect, plaintiff cannot practice an ounce of medicine,
23 can't treat a single patient, cannot hold itself out as
24 practicing.  So the idea that we are somehow withholding the
25 sources, the ultimate sources of revenue, the patients from

the plaintiff, has to be disabused soundly.

Secondly, Your Honor, we have the significant misconduct with regard to these accounts receivable. So firstly, as we point out in our affidavit as Dr. Vick does, Dr. John Vick, everybody's being paid, unlike when the plaintiff was managing the accounts. Everybody's being paid; patients are being treated; employees are being paid. So there is no harm to anyone.

If at the end of the day it were determined, however in our view incorrectly, by a judge or a jury that we had breached the agreement by keeping them out of, keeping their hands off the money that they, in our view, have misappropriated and abused, there would be an adequate remedy in damages.

Nobody is being harmed. What are they going to do? They're going to have to pay our creditors, and we believe they will continue to pay them in an improper manner. We suspect strongly that they're using the money for other purposes, but the bottom line is we are talking about injunctive relief. There is no emergency.

Secondly, with the argument that there's a 30-day cure, we gave a default notice that was, that as Dr. John Vick's affidavit reveals, we gave a default notice more than 30 days past, and there was no remedy. As to the misappropriation of the funds as outlined by the two doctors'

1  affidavits, the specific provision in the contract allows
2  termination without any 30-day cure notice under 11.2 for a
3  material misappropriation or embezzlement of the practice
4  operator's money.
5         That is precisely what we have set forth in the
6  affidavits, and that is precisely what the plaintiff has
7  done. The bottom line is, Your Honor, there is absolutely no
8  reason for injunctive relief at all and certainly not on an
9  emergency basis looking at groups of papers.
10        The public is being taken care of; the patients are
11 being taken care of. From our standpoint, extremely
12 important. The creditors are being taken care of. So at the
13 end of the day if it is determined that they have the right
14 to reassume the role of practice manager, they're going to
15 get a practice that is thriving, and that will, if there are
16 any damages, can adequately be addressed in a legal remedy.
17 Thank you, Your Honor.
18        THE COURT: Here's the way I see this case. It is
19 not a case for a temporary restraining order on the paper.
20 I'm not going to foreclose any type of injunctive relief.
21 That's a question that the Court should decide on the basis
22 of evidence with the witnesses and proof and after more due
23 consideration. I don't want to prejudge whether a
24 preliminary injunction is in order or not.
25        Here's what the Court can do. If the plaintiff

1  wants to push the issue of injunctive relief, I could be here
2  on the 12th at 8 o'clock, and I would hope we could get it
3  done in one day. If not I could go over to a little bit of
4  the next day, on the 13th. I'll make myself available for
5  that purpose.
6        I don't know if we'd be using this courtroom or
7  not. I think Judge Gilbert might be back. I'm not sure yet.
8  Vicki, do you know?
9        THE CLERK: He is coming back that week. We'll
10 find a place.
11       THE COURT: We'll find a place to do it. That
12 would give the parties time to take the necessary
13 depositions. It does not look like a complex case to me. It
14 looks like with a little discovery, this thing will be ready
15 to go.
16       I am authorized under Rule 65, if the parties wish,
17 to decide the whole case. Just a couple days, but if, you
18 know, somebody's going to demand a jury, I think you've still
19 got time to demand a jury.
20       MR. HENNESSY: Oh, yes, Your Honor, we were just
21 served Saturday.
22       THE COURT: I'm not asking you to make the
23 decision. If you decide you want me to, I could do it then
24 and bring it to a conclusion one way or the other.
25       So with that, I'm just going to make a docket

1  entry. I just don't think on this case that the severity of
2  the harm that might be occasioned by denying the temporary
3  restraining order is of a magnitude sufficient to deciding
4  something like this just on the basis of paper. Too many
5  things involved here.
6         When one party says, "Well, there is a breach."
7  The other party says there's not. One party says, "I have
8  time to cure," but the other party says, "Yeah, but we've
9  already defaulted you." There's too many things for a judge
10 to just decide by looking at paper.
11        I need some evidence on this. And there are other
12 people involved here, too, that I have to consider. There's
13 a medical practice that, apparently, people are still being
14 served. The plaintiff is providing a service for that
15 medical practice, although according to the defendant, not
16 adequately. There are many considerations.
17        Unless the parties inform me that they do not wish
18 to go forward, and that would be primarily on your part, I
19 will be here Thursday at 8 o'clock. I don't know which
20 courtroom I will be in. And we will get started, and we'll
21 have a hearing. Have your witnesses ready to go, and we'll
22 go till we get done.
23        And, Mr. Hennessy, if you decide that you want the
24 Court to decide the whole matter, I'd be happy to do that.
25 I'm not putting any pressure on you at all, and I'm not

1  trying to talk you out of a jury if that's what you want.
2  I'm just saying we can hear the case at that time, but it
3  just doesn't seem like to me like this is one of those real
4  complicated cases that would take an awful lot of time to
5  take care of.
6         MR. HENNESSY:  Yes, Your Honor.
7         THE COURT:  Now, have I overlooked or misstated
8  anything that someone wants me to address?
9         MR. MORRIS:  The only additional, Judge, is that we
10 appreciate the Court giving the time early in July, and I
11 assume by your comments, as you said, we could take whatever
12 depositions without making a formal motion for expedited
13 discovery.
14        THE COURT:  That's implicit in what I'm saying
15 here.  Mr. Hennessy is an experienced man.  He knows to just
16 get together and get your discovery done.
17        MR. HENNESSY:  Yes, Your Honor.
18        THE COURT:  I'm aware of all the requirements of
19 Rule 26, but I take it on this case here the parties can get
20 together, and I'm doing this because I think everyone's
21 entitled to a hearing and adequate notice and time to
22 prepare, including the defendant.
23        Mr. Hennessy, anything I've overlooked or mistaken?
24        MR. HENNESSY:  I don't believe so.
25        THE COURT:  Unless I hear otherwise, I'll be here

1  at Thursday at 8 o'clock on July the 12th.
2      (End of hearing.)

## REPORTER'S CERTIFICATE

I, Jane McCorkle, Official Court Reporter for the United States District Court for the Southern District of Illinois, do hereby certify that the above and foregoing is a true and correct transcript of the proceedings of Temporary Restraining Order had in this cause as same appears from my stenotype notes made personally during the progress of said proceedings.

DATE: 7/3/07         *[signature]*
                      JANE McCORKLE